■   In the Matter of ELLERY C. (Anonymous), Appellant.— In a proceeding under article 7 of the Family Court Act, in which appellant was previously adjudged to be a person in need of supervision, the appeal is from an order of the Family Court, Kings County, entered April 5, 1972, which directed that appellant be placed in the New York State training school.   Order affirmed, without costs.   The record reveals that appellant, who is now 15 years old, was adjudged a person in need of supervision in March, 1971.   He was placed on probation for one year by an order dated April 15, 1971, but probation was revoked four months later for his violations.   He was paroled to his uncle in Alabama for four months, but he returned home in two weeks.   He was remanded to a Juvenile Center for placement planning, but this was unsuccessful.   He was then referred to the Federal Addiction Services, but he voluntarily left that program.   Other efforts to place him with the Samaritan Half-Way House and Alpha House were also unsuccessful.   Finally, in April, 1972 after his mother indicated again that she could not control him, the order appealed from was entered.   In placing appellant in the State Training School, the Family Court followed the recommendation of the Probation Department. We are of the opinion that that was the proper course to follow.   If any substantiation was needed, it was supplied on oral argument of this appeal, when this court was advised that appellant has run away twice from the temporary shelter where he has been staying pending this appeal.   Where, as here, every effort to place the infant in question in a nonstructured facility meets with failure, the only "suitable environment" (see dissenting memorandum), unfortunately, is the confinement of a State Training Center (see Matter of Tomasita N., 37 A D 2d 698, affd. 30 N Y 2d 927).   Munder, Latham and Christ, JJ., concur; Shapiro, J., dissents and votes to reverse the order and remit the proceeding to the Family Court for the purpose of placing appellant in a suitable environment (Family Ct. Act, § 756, subd. [a]), with the following memorandum, in which Rabin, P. J., concurs: The infant appellant, now a little over 15½ years of age, suffers from a drug, alcohol and mental problem.   He has been adjudicated a person in need of supervision on the petition of his mother. He has not, however, been adjudicated a juvenile delinquent and there has

been no finding that he ever committed any act which, if done by an adult, would constitute a crime (Family Ct. Act, § 742). The distinction between a finding of delinquency and a determination of a need for supervision is a fundamental one which may not be disregarded. Section 743 of the Family Court Act provides that a "dispositional hearing" in the case of a petition for *delinquency* is one to determine whether the respondent requires *supervision, treatment or confinement,* whereas such a hearing in a need-for-supervision case is to determine whether the respondent requires *supervision or treatment.* The omission of the word *"confinement"* is no mere oversight, as the Second Report of the Joint Legislative Committee on Court Reorganization (McKinney's 1962 Session Laws, p. 3428) makes clear. In that report the committee said (pp. 3435–3436) : "The decision not to authorize a commitment in the case of a person in need of supervision is an important element of the statutory pattern. Any commitment — whether 'civil' or 'criminal', whether assertedly for 'punitive' or 'rehabilitative' purposes — involves a grave interference with personal liberty and is justified only by urgent reason. This urgent reason has not been shown in the instance covered by the statutory definition of 'person in need of supervision' * * * There is a second reason for this decision. The Committee has been advised by many persons that existing facilities for children are not wholly satisfactory. Demands on limited space, staff and facilities have increased with the rapid expansion of our young population since the end of World War II. Under normal circumstances, institutionalization presents difficulties. With increased demand not fully met, it becomes even more difficult to realize not in theory, but in practice, the asserted purposes of commitment in these cases. These facts, in the Committee's judgment, make it even more difficult to justify a commitment in the absence of delinquency as defined here." The committee also stated that "the common understanding is that such an adjudication [of delinquency] involves a youth who commits crimes and requires supervision, treatment or commitment" (p. 3434). It also said that the proposed redefinition of "juvenile delinquent" and creation of the category of "person in need of supervision" grew out of its review of the then existing definition of delinquency, the procedures in the Children's Courts and Domestic Relations Courts, and the practices with respect to detention and commitment (p. 3434). The committee also noted that it had been asked "to avoid the need for an adjudication of 'delinquency'" by the expedient of not using that term or any similar name in describing the occasions for the exercise of the court's jurisdiction, but that it rejected the proposal because it feared that the practical result "would be an indiscriminate grouping of all children within the court's jurisdiction as 'delinquent'" (p. 3435). The committee therefore decided "to retain, but redefine, the category of juvenile delinquency and add the new category of person in need of supervision" (p. 3435). It went on to express the expectation "that this pattern will reduce the instances of stigma and at the same time *permit the court to use appropriate resources in dealing with persons in need of supervision"* (p. 3435; italics supplied). Here, as in *Matter of Lloyd* (33 A D 2d 385) and in *Matter of Jeanette P.* (34 A D 2d 661), the learned Family Court Judge was faced with a dilemma and was doubtless trying to do "the best that he could for the appellant in a well-nigh impossible situation" (*Matter of Lloyd, supra,* p. 386). This case, as did *Matter of Jeanette P. (supra,* p. 661), "points up again the increasingly urgent need for proper facilities to provide adequate supervision and treatment for infants found to be persons 'in need of supervision' pursuant to subdivision (b) of section 712 of the Family Court Act." Although the Legislature, after first interdicting the

commitment to State Training Schools of young people in need of supervision on the basis of the finding that such facilities are hardly a beneficial haven for them, allowed such disposition of them as a stopgap measure for four successive years (L. 1964, ch. 518 [one year]; L. 1965, ch. 126, § 1 [one year]; L. 1966, ch. 705, § 1 [two years]) and thereafter permanently authorized such a disposition (L. 1968, ch. 874, § 1), it did so without in any way retracting the completely sound reasons which originally had led it to ban such action. In fact this court, as recently as April, 1970, in *Matter of Jeanette P.* (34 A D 2d 661, *supra*), in speaking of the desirable effect of the statutory command that a person in need of supervision be given "supervision and treatment", not "confinement", quoted from *Matter of Gault* (387 U. S. 1, 27), in which the court said: "The fact of the matter is that, however euphemistic the title, a 'receiving home' or an 'industrial school' for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. His world becomes 'a building with whitewashed walls, regimented routine and institutional hours * * *.' Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, state employees, and 'delinquents' confined with him for anything from waywardness to rape and homicide". Our State schools, in addition to containing juvenile delinquents who have committed acts which would be crimes if they were done by adults, also contain juveniles convicted of offenses against the United States who have been sentenced to imprisonment by a court of the United States (Executive Law, art. 19-G, § 527). The confinement in the training school of the infant appellant with juveniles convicted of criminal acts can hardly, in any realistic sense, serve as "supervision" and "treatment" for him. On the contrary, it may well result in his emerging from his incarceration well tutored in the ways of crime.[1] Such confinement is not consistent with the implied, if not explicit, purposes set forth in section 255 of the Family Court Act, which authorizes the court to seek the co-operation of and use "the services of all societies or organizations, public or private, having for their object the protection or aid of children or families * * * to the end that the court may be assisted in every reasonable way to give the children * * * within its jurisdiction *such care, protection and assistance as will best enhance their welfare*" (italics supplied). The respondent seeks to justify appellant's commitment to a State Training School by claiming that the "State Training School, while not ideal, is the only facility available which could possibly help this boy become a constructive member of society." Not only is this not established by the record,[2] but, even if it were so, it would hardly justify the

---

1. M. E. Alexander, *Jail Administration* (Springfield, Ill., Charles C. Thomas), p. 5: "It is an unhappy but well-established fact that far too many jails — hundreds of them — while presumed to be the bulwark of community social protection, actually are little more than the enforced common meeting places for social derelicts who find there the greatest opportunity to infect the casual offender, the weak, the unsophisticated, the morally retarded, and the socially inadequate."

2. The Citizens Committee for Children of New York, Inc., made a study of the operations of The New York State Training School System. In its report, among other things, it concluded: "The child's right to an education is not observed by the training schools. Many children do not receive even the minimal educational services to which they are entitled by law." Furthermore, it found: "Although the drug problem is becoming greater all the time, there

proposed confinement of appellant with adjudicated juvenile delinquents in a prison environment. As we recently said in *Matter of Arlene H.* (38 A D 2d 570, 571), "we reject, as defeatism, the premise that children in need of aid and supervision [and treatment], such as appellant, must be confined as quasi criminals because allegedly there are no viable alternatives (cf. *Matter of Jeanette P., supra)*". In *Matter of Stanley M.* (39 A D 2d 746), where the minor, like appellant here, had violated his probation and left a drug rehabilitation program in which he had been placed because it was not suited for him but for older persons and had thereafter been placed in a State training school, we said (p. 747): "In our opinion, the placement in the training school, without giving appellant a final chance at rehabilitation in a program designed for his needs and age, was an improvident exercise of discretion. * * * While the approach of the probation officer and the Family Court is readily understandable, we believe that, under all of the circumstances, there should be a remission to the Family Court for the purpose of placing appellant in an environment more suitable to his present condition and age". I have heretofore discussed the contention by respondent that the State Training School is the only facility available "which could possibly help this boy become a constructive member of society," noting that such a favorable outcome is hardly likely to result from the incarceration of appellant with adjudicated delinquents, but what is of equal importance, in this connection, is that I find, in this record, no evidence to sustain the claim that all available means of supervision and treatment of appellant other than confinement in a State Training School have been exhausted.[3] Additionally, I do not believe that the State or City of New York may default in its duty under the statute to provide a minor with supervision and treatment suitable for his needs (cf. *Matter of Lloyd*, 33 A D 2d 385, 387).[4] *Matter of Tomasita N.* (37 A D 2d 698, affd. 30 N Y 2d 927) is cited by the majority as authority for the proposition that "Where, as here, every effort to place the infant in question in a nonstructured facility meets with failure, the only 'suitable environment', unfortunately, is the confinement of a State Training Center" I do not believe that case stands for any such proposition. The only contention there made on this point was that the Family Court denied the appellant *due process* when it committed her to a state training center. The factual propriety (as distinguished from the constitutional validity) of such a commitment was neither raised in nor considered by the Court of Appeals.

---

is no special capacity or plan to meet the problem" and "there are only token mental health services, even in those training schools established to help the 'most disturbed' children." The report is dated December 15, 1969, but we know of no appreciable change in conditions since then.

3. Inquiry of the social worker who handled appellant in connection with his referral to various rehabilitative social agencies revealed that he knows of at least three private facilities for treatment of a person in need of supervision such as appellant to which he could be assigned for supervision and treatment.

4. Ferster, Snethen and Courtless, Juvenile Detention: Protection, Prevention or Punishment?, 38 Fordham L. Rev. 161, 194; "Indifference on the part of the public, the legislatures, the police and the juvenile court has created detention procedures and practices in many communities which do not protect the rights of the public or the juvenile and which also fail to meet the needs of neglected and dependent children. This state of affairs will continue until indifference is

replaced by concerned supporters, creative solutions, and the funds to carry them out."